1

2

3            UNITED STATES DISTRICT COURT

4          WESTERN DISTRICT OF WASHINGTON
                      AT SEATTLE
5

6   KATHIE COSTANICH,                          Case No. C05-0090MJP

7                    Plaintiff,

8         v.                                   ORDER GRANTING IN PART
                                               DEFENDANTS' MOTION FOR
9   STATE OF WASHINGTON, DEPARTMENT OF         SUMMARY JUDGMENT AND
    SOCIAL AND HEALTH SERVICES (DSHS), et      DISMISSING PLAINTIFF'S
10  al.,                                       STATE CLAIMS WITHOUT
                                               PREJUDICE
11                   Defendants.

12

13         This matter comes before the Court on the parties' motions for summary judgment.

14  Defendants have filed a global motion, requesting summary judgment on all of Plaintiff's claims

15  against all defendants. (Dkt. No. 94.)  Plaintiff has filed a partial motion for summary judgment on

16  her federal 42 U.S.C. § 1983 claim against Defendant Sandra Duron. (Dkt. No. 92.)  Having

17  considered the motions, responses, and replies, all documents submitted in support thereof, and

18  the record herein, the Court DENIES Plaintiff's motion, GRANTS IN PART Defendants'

19  motion, and DECLINES to exercise supplemental jurisdiction over Plaintiff's state law claims.

20                              **Background**

21         This case arises from a finding by the Washington Department of Social and Health

22  Services ("DSHS") that Plaintiff Kathie Costanich emotionally abused the children in her foster

23  home and from DSHS's revocation of Plaintiff's foster care license.  The Washington Court of

24  Appeals described the facts leading to the license revocation as follows:

25         Kathie Costanich and her husband Ken were foster parents devoted to caring for some
           of the neediest and most difficult foster children in the system.  Costanich's foster
26         home received accolades from the state, but she also regularly used profanity,
           sometimes swearing around her foster children. . . .

27

ORDER — 1

Costanich was a licensed foster parent in Washington for over 20 years. Her license allowed her to provide foster care for up to six children at a time, and she sometimes had waivers to care for additional children. All of these children had been victims of abuse or neglect and many had severe behavioral, developmental, and medical problems. She specialized in violent, sexually aggressive youth and medically fragile infants. Costanich was also the president of Foster Parents of Washington State and a trainer for DSHS. Before the abuse allegations, the most recent state evaluation described the Costanich foster home as a "unique and valuable resource … unsurpassed by any foster home in the State."

During the summer of 2001, DSHS investigated an allegation that Costanich emotionally and physically abused her foster children, based on what K., one of her foster children, told his therapist. At the time of the investigation, Costanich had six foster children living in her home: F. (17), K. (15), J. (12), P. (10), and two sisters, E. (8) and B. (4). [1] Sandra Duron investigated the allegations for CPS [(Child Protective Services)] and reported there was inconclusive evidence of physical abuse, but the emotional abuse allegations were "founded." This finding was based primarily on two specific incidents. K. claimed that Costanich said "I'll kill you bastard" to F., when she had to pull him off one of her female aides. The aide and F. had gotten into an altercation because F. was spying on her while she was sunbathing. K. also said Costanich told P., the only African-American child in the house, to move his "black ass." Additionally, he alleged Costanich had a general habit of swearing at the children and had called E. a "cunt." Later investigation resulted in allegations that Costanich also called E. a "bitch." On March 14, 2002, DSHS informed Costanich that it upheld the finding of emotional abuse after an internal review. On August 16, 2002, DSHS revoked Costanich's foster care license based primarily on this finding of abuse.

Costanich v. Dep't of Social and Health Servs., 138 Wn. App. 547, 551-53 (2007).

Plaintiff's allegations in this case focus on Sandra Duron's investigation of the allegations of child abuse. Ms. Duron interviewed each of the foster children in Plaintiff's home, all but one of whom stated that Ms. Costanich used profanity regularly. (Id. ¶¶ 3-4 & Exs. B & D.) Some of the children alleged that Ms. Costanich directed the profanity at the children (see id.) and several reported that Ms. Costanich used physical violence towards some of the children and put urine-soaked sheets in P.'s face. (Id., Ex. D.) Ms. Duron also contacted the in-home assistants, some of the children's therapists, family friends, Ms. Costanich's sister, and Ms. Costanich herself. (See id.) Although Ms. Duron reported that she had interviewed many of the children's therapists and social workers, she admitted in cross-examination that she had not actually interviewed, but had

---

[1]    The Costanichs' were also the legal guardians of E. and B. and had raised them since infancy.

ORDER — 2

1   only "contacted" or "spoken to" eighteen of the 38 people she identified as having interviewed.

2   (See Plf's Mot., Exs. 14-18.)  Ms. Duron also admitted on cross-examination that although she

3   reported K.'s statements about violence and profanity in the home, K. actually "wouldn't say

4   much" during his interview, and she admitted that she did not interview K.'s therapist, Mr. Crabb,

5   to whom K. had made his initial complaint. (Id., Ex. 16.)  Ms. Duron reported that almost all of

6   the witnesses (including Ms. Costanich herself) confirmed that Ms. Costanich uses profanity

7   regularly but differed on whether that profanity was ever directed at the children or whether Ms.

8   Costanich ever used physical violence with the children. (Duron Decl., Ex. D.)

9          In the fall of 2001, several of the children's medical providers or therapists wrote to

10  DSHS on behalf of Ms. Costanich, stating that they believed that Ms. Costanich was providing a

11  positive home for the children in which the children were thriving. (Plf's Resp., Ex. 1.)  Around

12  that same time, several witnesses interviewed by Ms. Duron wrote DSHS complaining that Ms.

13  Duron had misrepresented their statements to her, had badgered them into making an abuse

14  allegation, and/or had associated statements with them that they had never made. (Plf's Resp., Ex.

15  2.)  Ms. Duron states in her declaration that these letters did not influence her decision because

16  she "knew these witnesses were mistaken." (Duron Decl. ¶ 11.)

17         DSHS held several "staffings" regarding the abuse allegations against Ms. Costanich.

18  (Duron Decl. ¶¶ 5-8.)  Ms. Duron also hired an outside consultant, clinical psychologist Beverly

19  Cartwright, to give input regarding the allegations.  Based on records provided by DSHS and

20  input provided by Ms. Duron and her supervisor, Dr. Cartwright opined that "[p]ejorative

21  statements can erode a child's confidence, a child's will to succeed and capacity to change . . . .

22  This behavior can also maintain attachment difficulties, undermine relationships with authority

23  figures, and exacerbate poor self-management styles that include not [only] withdrawal and

24  suppression of emotions, but also acting out." (Id., Ex. E.)  Dr. Cartwright did not independently

25  meet with any of the children.

26         In 2001, the definition of child abuse included cruel or inhumane acts, "regardless of

27

ORDER — 3

1    observable injury," and actions that injured or created a risk to a child's mental health or

2    development. Former WAC 388-15-130(3)(d), (g) (2001).  Moreover, in 2000, the Washington

3    Court of Appeals held that the use of profanity towards children constituted "humiliating

4    discipline" in violation of Former WAC 388-73-046(2). <u>Morgan v. DSHS</u>, 99 Wn. App. 148, 155

5    (2000).  Based on her review of the records, her interviews, consultation with her direct

6    supervisor Beverly Payne and Dr. Cartwright, several case staffings, and the governing law at the

7    time, Ms. Duron made a finding of "inconclusive" as to physical abuse and "founded" as to

8    emotional abuse. (Duron Decl. ¶ 10 & Ex. D.)  Ms. Costanich was informed of the finding by a

9    letter sent by Beverly Payne in December 2001. (Smith Decl., Ex. A.)  Kyle Smith from DSHS

10   reviewed the finding and concluded, after reviewing the record and conducting a few additional

11   interviews, that it was supported by the evidence. (Smith Decl. ¶¶ 4-7.)

12         On March 28, 2002, the State filed a motion to terminate the Costanichs' guardianship of

13   E. and B.[2]  The State offered in support a March 6 declaration from Ms. Duron in which she

14   describes her investigation and the statements of the witnesses, and concludes that "Ms. Costanich

15   uses profanity, name-calling and derogatory racial terms as means to discipline and intimidate the

16   children." (Duron Decl., Ex. F.)  Before the King County Juvenille Court ruled on the motion to

17   terminate guardianship, the Kalispell Tribe (of which E. and B. are members) intervened and

18   assumed jurisdiction of the case.  The Tribe chose to have the girls spend time with extended

19   relatives during the summer of 2002 and then returned the girls to the Costanich home in August

20   of 2002. (Timentwa-Wilson Decl. ¶¶ 6-8.)

21   _____

22         [2]    The State filed the motion to terminate with the support of E. and B.'s new social
     worker, Jackie Timenta-Wilson. Ms. Timenta-Wilson replaced the girls' previous social workers, E.
23   Nelson and S. Hunter.  Ms. Nelson testified that she was transferred off the girls' case because her
     supervisor felt that she "was not being active enough in taking steps to remove the children" from the
24   Costanich household. (Plf's Resp., Ex. 9.) Ms. Hunter similarly testified that the case was "suddenly"
     gone from her caseload and that she was told not to have any contact with the girls' next social
25   worker. (<u>Id.</u>)  Both Ms. Nelson and Ms. Hunter had recommended that the girls should remain with
     Ms. Costanich.  Ms. Timenta-Wilson testified that she was instructed not to talk about the girls' case
26   with Ms. Hunter. (<u>Id.</u>, Ex. 10.)

27

ORDER — 4

1    In August 2002, Ingrid McKinney, licensor of the Costanich foster home, revoked the

2 foster care license due to the finding of emotional abuse and violations of the minimum licensing

3 requirements for foster homes. (McKinney Decl. ¶ 5, Ex. B.)  Under the governing regulations,

4 DSHS must revoke a foster care license if the provider was found to have committed child abuse

5 or neglect unless the department determines that the foster parent does not pose a risk to the

6 child's safety, well-being, and long-term stability. WAC 388-148-0095(2)(b).  Ms. McKinney's

7 decision was reviewed and approved of by her supervisor at the time, James Bulzomi. (Id. ¶ 5.)

8    Ms. Costanich appealed both the finding of abuse and the revocation of her license in an

9 administrative hearing.  After a nineteen day hearing that included testimony from forty-nine

10 witnesses, on January 16, 2004, the ALJ overturned DSHS' decision, concluding that the finding

11 of emotional abuse was unfounded. (Lux Decl., Ex. A.)  DSHS appealed this decision to the

12 DSHS Board of Appeals.  On August 11, 2004, the review judge reversed the ALJ's initial

13 decision. (Id., Ex. B.) He found there was substantial evidence that Ms. Costanich had threatened

14 to kill F., told P. to move his "black ass," called E. profane names, and swore at the children in

15 her home. (Id. at 79-80.)  The review judge concluded this constituted emotional abuse and

16 justified revoking her license. (Id. at 80.)  Costanich sought judicial review, and on October 13,

17 2005, the King County Superior Court reversed the review judge's final administrative decision

18 and awarded attorney's fees. (Id., Ex. C.)  In January 2007, the court of appeals affirmed the

19 decision of the superior court, upholding the ALJ's conclusion that Ms. Costanich's use of

20 profanity did not pose a "substantial risk" to the mental health or development of the children and

21 did not constitute "humiliating discipline" under the applicable regulations. Id. at 561-62.  On a

22 motion for reconsideration, the court of appeals awarded attorney's fees because "although DSHS

23 was justified initially in its concerns about Costanich's use of profanity, the evidence before the

24 ALJ shows that DSHS was not substantially justified in revoking her license once it became aware

25 of the problems of Duron's investigation." Costanich, 138 Wn. App. at 564.

26    The court of appeals described the findings of the ALJ and DSHS Review Board

27

ORDER — 5

1  regarding the allegations against Ms. Costanich and regarding Ms. Duron's investigation as

2  follows:

3        The ALJ found that, although Costanich used profanity around the children, her
      swearing was "never directed at the children." He also found that she told P. to

4        move his "black ass." There was substantial evidence for these findings. He based
      them solely on the testimony of the adult witnesses at the hearing, including the

5        children's therapists and the aides who worked in the Costanich home. The ALJ
      explicitly chose not to rely on [Sandra Duron's] hearsay statements about what the

6        children told her. In contrast, the [DSHS] review judge based his decision to
      uphold the revocation of Costanich's license on four factual findings: (1)

7        Costanich's telling F., "I'll kill you bastard," (2) telling P. to move his "black ass,"
      (3) calling E. a "bitch" and a "cunt," and (4) swearing at the children. The review

8        judge added findings one and three, and finding four is in direct conflict with the
      ALJ's characterization of Costanich's swearing. . . .

9
      The review judge's three contested findings are all based primarily on the CPS

10       investigators' hearsay statements, which the ALJ found not credible.

11       The review judge relied heavily on the investigator's claim that she took
      near-verbatim notes from her interviews with E., F., and K., none of whom

12       testified before the ALJ. The review judge stated: "[T]he undersigned presumes
      that the statements of the children reported in Ms. Duron's near-verbatim notes are

13       the words of the children rather than the interpretation or summary of Ms. Duron."
      But Duron herself admitted that she did not always take near-verbatim notes,

14       stating on cross-examination that K. "wouldn't say much, so I just kind of
      summarized what he was saying." Duron conducted all but one of her interviews

15       with the children without a third person present and did not record any of the
      interviews. The only documentary evidence of the interviews in the administrative

16       record is her service episode reports (SERs), which represent the data she entered
      into the computer from her handwritten notes. The original near-verbatim notes

17       were not produced at the hearing. And the SERs show that she put words in the
      mouth of at least one of the children. When interviewing J., Duron asked, "When

18       you say[], 'go to your fucken [sic] room' whom does she [Costanich] say that
      to[]?" But J. never claimed Costanich said that. Additionally, even the review

19       judge acknowledged that there were a number of problems with Duron's reporting
      of her conversations with adults, including that she made up the statement of one

20       witness and misquoted a number of others. The review judge acknowledged that
      Duron's reports of her interviews with adults were incredible but assumed that her

21       interviews with the children were accurate, "near verbatim" recordings simply
      because she said so. . . .

22
      [T]he ALJ explicitly based his decision only on the testimony of the witnesses at

23       the hearing, not on Duron's reports and hearsay statements. He found it was
      impossible to determine whether she was "taking the answers out of context or to

24       know whether or not the answering party fully understood the nature of the
      question being asked." He also found K.'s statements as recorded by his therapist

25       lacking in credibility. The review judge not only ignored the ALJ's credibility
      determinations, he also chose to base his decision on the very evidence the ALJ

26       rejected as lacking credibility: the testimony of [Sandra Duron] and K.'s hearsay
      statements to his therapist. The review judge substituted his own view of the

27

1    evidence for the ALJ's findings, which are supported by substantial evidence.

2    Costanich, 138 Wn. App. at 557-59.

3            On December 20, 2004, while her appeal of the review judge's decision to the superior

4    court was pending, Ms. Costanich filed a tort suit in King County Superior Court against the

5    State of Washington, Department of Social and Health Services, Sandra and John Doe Duron,

6    Carol and John Doe Schmidt, Beverly and John Doe Payne, James and Jane Doe Bulzomi, Robert

7    and Jane Doe Stutz, and Ingrid and John Doe McKinney. (Dkt. No. 1.)  Plaintiff asserts violations

8    of her civil rights under 42 U.S.C. §1983 and asserts claims of intentional infliction of emotional

9    distress (outrage), negligent investigation, malicious prosecution, and abuse of process.[3]  (See

10   Dkt. No. 84, Second Am. Compl.)  Plaintiff claims that DSHS and its employees conducted a

11   malicious and intentionally defective investigation into accusations that she emotionally abused the

12   children in her care.  She alleges that DSHS's actions deprived her of her livelihood and her

13   children, and inflicted serious emotional and financial trauma upon her and her family. (Id.)

14           Defendants timely removed the action to federal court. (Dkt. No. 1.)  This Court

15   postponed issuing a scheduling order in this case while the superior court case was pending, and

16   then ordered that this matter be stayed while the State appealed its loss in the superior court.

17   (Dkt. No. 38.)  After the court of appeals issued its decision, the stay was lifted and a scheduling

18   order issued on March 6, 2007. (Dkt. No. 53.)

19           Plaintiff now moves for partial summary judgment on her federal claim against Defendant

20   Duron.  Plaintiff argues that Ms. Duron fabricated evidence against her, twisted the children's

21   words, and filed a false report and false statements against Ms. Constanich all in violation of Ms.

22   Costanich's right to due process.  Defendants have also moved for summary judgment on all of

23   Plaintiff's claims against all defendants.  Defendants argue that all of the defendants are either

24   immune from suit or are not "persons" subject to § 1983 liability.  Defendants also argue that the

25

26           [3]        Plaintiff has withdrawn her negligent infliction of emotional distress claim. (Plf's Resp.
     at 9 n.3.)

27

ORDER — 7

1   record does not support any of Plaintiff's claims.

2                                        **Discussion**

3   **I.     Motions to Strike**

4          As a preliminary matter, Defendants have moved to strike several references in Plaintiff's

5   response to Defendants' motion for summary judgment.

6          **A.     Settlement Offer**

7          Defendants move to strike all references to an offer that Defendants' allegedly made to

8   Plaintiff.  Ms. Costanich has presented testimony from three witnesses who attended a November

9   14, 2001, meeting at which DSHS apparently offered to refrain from pursuing guardianship

10  termination proceedings against Ms. Costanich if she did not appeal the agency's emotional abuse

11  finding. (Plf's Resp., Ex. 14.)  Two of the witnesses state in their testimony that such an offer was

12  made and one witness states that the agency was "exploring" that kind of an offer with Ms.

13  Costanich. (Id.)

14         Defendants move to strike references to this offer under Federal Evidence Rule 408(a)(1)

15  & (2).  Evidence Rule 408 states that evidence of offers to compromise are not admissible "when

16  offered to prove liability for, invalidity of, or amount of a claim . . . ." Fed. R. Evid. 408.  Here,

17  Plaintiff does not rely on the offer to prove liability for or invalidity of a claim, but to show that

18  DSHS inappropriately pressured her to accept its abuse finding.  The motion to strike evidence of

19  the offer is DENIED.

20         **B.     Testimony of non-party witnesses**

21         Defendants move to strike the testimony of several non-parties who testified at the

22  administrative hearing under Federal Evidence Rule 804(b) because Plaintiff has not shown that

23  these witnesses are unavailable to testify.  Federal Evidence Rule 804(b) states that the testimony

24  of a witness from a prior hearing is exempted from the hearsay rule only if the declarant is

25  unavailable as a witness.  Although these declarations would not be admissible at trial without

26  demonstration of the declarants' unavailability, the declarations are sufficient at the summary

27

ORDER — 8

judgment stage. See Fraser v. Goodale, 342 F.3d 1032, 1036 (9th Cir. 2003) ("At the summary judgment stage, we do not focus on the admissibility of the evidence's form.  We instead focus on the admissibility of its contents.").  The motion to strike this testimony is DENIED.

### C.    Letters

Defendants ask the Court to strike many of the letters sent to DSHS by doctors, aide workers, and others — letters that detailed that the Costanichs were providing a good home and alleged that Ms. Duron "twisted" the witnesses' words in her reporting of their interviews. (See Plf's Resp., Exs. 1 & 2.)  Defendants argue that the letters should be excluded both because they were not signed under penalty of perjury and because they are irrelevant in that they do not reveal when DSHS received the letters or what bearing they had on the DSHS investigation.

Letters that are not sworn under penalty of perjury cannot be used by the non-movant to create an issue of material fact on summary judgment. See Fed. R. Civ. P. 56(e); 28 U.S.C. § 1746. Ms. Costanich offers several unsworn letters from the following individuals: Dr. H. Bartlett Vincent,[4] Shawn S. Brown, Richard Crabb, Francis Mark Froes, Donna Ewy, Victoria Kay McLaughlin, Sara L. McLaughlin, and F. (Plf's Resp., Ex. 1.)  To the extent that they are used to prove the truth of the matter asserted — that Ms. Costanich provides a non-abusive household to the foster children in her care and that Ms. Duron misrepresented witness statements and put words into witnesses mouths — these unsworn statements will not be considered.  But to the extent that they are only used to show what evidence DSHS had before it, unsworn letters, as long as they are dated, are sufficient and acceptable on summary judgment.  All of the unsworn letters are dated except the letters from Victoria McLaughlin, Sarah McLaughlin, and F. (Id.) The undated unsworn letters will not be considered.  Therefore the motion to strike is GRANTED IN PART and DENIED IN PART.

_____

[4]    Two of Dr. Vincent's letters — those sent on December 7, 2001 — are not sworn under penalty of perjury.  Another letter sent by Dr. Vincent on March 26, 2002, is sworn under penalty of perjury. (See Plf's Resp., Ex. 1.)

ORDER — 9

1   **II.   Summary Judgment Standard**

2        Summary judgment will be granted when there is no genuine issue as to any material fact

3   and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).  The party

4   seeking summary judgment bears the initial burden of informing the court of the basis for its

5   motion, and of identifying those portions of the pleadings and discovery responses that

6   demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S.

7   317, 323 (1986).  Where the moving party will have the burden of proof at trial, it must

8   affirmatively demonstrate that no reasonable trier of fact could find other than for the moving

9   party. Calderone v. United States, 799 F.2d 254, 259 (6th Cir. 1986).  On an issue where the

10  nonmoving party will bear the burden of proof at trial, the moving party can prevail merely by

11  pointing out to the district court that there is an absence of evidence to support the non-moving

12  party's case. Catrett, 477 U.S. at 325.  If the moving party meets its initial burden, the opposing

13  party must then set forth specific facts showing that there is some genuine issue for trial in order

14  to defeat the motion. Anderson v. Liberty Lobby, 477 U.S. 242, 250 (1986).

15  **III.   Collateral Estoppel**

16       Plaintiff argues that Defendants are collaterally estopped "from denying that Ms.

17  Costanich did not swear at children or otherwise abuse or harm any child, that DSHS had no

18  credible evidence that she [had] done so, that Duron's reports were not reliable or credible, that

19  Duron made up and misquoted witness statements, that DSHS was not justified in revoking Ms.

20  Costanich's foster care license because they knew of the trouble with Duron's investigation."[5]

21  (Plf's Resp. at 11-12.)  Federal courts are required to give the same preclusive effect to state

22  court judgments as would be given that judgment under the law of the state in which the judgment

23  was rendered. Migra v. Warren City Sch. Bd. of Educ., 465 U.S. 75, 81 (1984).  Under

24

25       [5]   Plaintiff also argues that the ALJ's findings are the facts here because a "presumption of correctness applies to the factual determinations of both trial and appellate state courts." (Plf's
26  Resp. at 6.)  A "presumption of correctness" applies in habeas cases, see e.g., Steele v. Young, 11 F.3d 1518, 1520 n.2 (10th Cir. 1993), but is not a consideration in the context presented here.
27  ORDER — 10

1   Washington law, a party asserting collateral estoppel must show that (1) the issue in the prior

2   adjudication is identical to the one presented in the later action, (2) the prior adjudication ended

3   with a final judgment on the merits, (3) the party against whom estoppel is asserted was a party or

4   in privity with a party to the first action, and (4) application of the doctrine will not work an

5   injustice on the party against whom it is pleaded. <u>Lutheran Day Care v. Snohomish County</u>, 119

6   Wn.2d 91, 115 (1992).  Washington courts will apply preclusive effect to findings of an

7   administrative body.  In making the decision whether to do so, courts consider "(1) whether the

8   agency acting within its competence made a factual decision; (2) agency and court procedural

9   differences; and (3) policy considerations." <u>Reninger v. Dep't of Corrs.</u>, 134 Wn.2d 437, 450

10  (1998).

11          The Court will not apply collateral estoppel to the findings or decisions of the agency or

12  state courts because the issues considered by the agency and the state courts are not identical to

13  the issues presented here.  The ALJ considered whether the referral alleging abuse or neglect

14  should be founded, whether acts committed by Ms. Costanich were cruel or inhumane or did

15  result in injury or a substantial risk of injury to the physical or mental health or development of a

16  child, and whether DSHS's decision to revoke the foster care license should be upheld. (Lux

17  Decl., Ex. A, at 2.)  The ALJ did not consider whether Ms. Duron's investigation and/or the acts

18  of the other DSHS employees were tortious or violated Plaintiff's constitutional rights.  The main

19  factual issues here — whether Ms. Duron fabricated evidence, misrepresented witness statements,

20  and/or badgered witnesses and whether the other DSHS employees participated in that faulty

21  investigation — were not issues at the agency or state court levels.  Therefore, the findings of fact

22  and conclusions of law made by the ALJ, DSHS Review Board, and state courts do not control

23  here.

24  **IV.    42 U.S.C. § 1983 Claim**

25          Plaintiff asserts claims against all defendants under 42 U.S.C. § 1983 for violations of her

26  due process rights.  Section 1983 creates a private right of action against individuals who, acting

27

ORDER — 11

1   under color of state law, violate federal constitutional or statutory rights.  Plaintiff alleges a

2   falsification-of-evidence claim.  To establish this due process claim, Plaintiff must show a

3   government deprivation of life, liberty, or property.  Nunez v. City of Los Angeles, 147 F.3d 867,

4   871 (9th Cir. 1998).  Here, Defendants do not dispute that Plaintiff has property and liberty

5   interests in her foster care license or that she has a liberty interest in the care of E. and B.

6        Defendants argue that Plaintiff's § 1983 claims must fail because DSHS is not a "person"

7   subject to 1983 liability and because the individually named defendants are immune from suit.

8        **A.    "Persons" under 42 U.S.C. § 1983**

9        Plaintiff has alleged a federal claim against the Washington State Department of Social and

10  Health Services.  Neither the state nor its agency "arms" are "persons" subject to § 1983 liability.

11  See Will v. Mich. Dep't of State Police, 491 U.S. 58, 70 (1989).  Although Plaintiff correctly

12  cites Lapides v. Board of Regents for the proposition that the State waived its Eleventh

13  Amendment immunity when it removed this case to federal court, Lapides itself makes clear that

14  such waiver does not make a state or its agencies "persons" under § 1983.  See 535 U.S. 613, 617

15  (2002).  The Court dismisses Plaintiff's claims against DSHS.[6]

16       **B.    Absolute Immunity**

17       The individually named defendants argue that they are absolutely immune from § 1983

18  liability for their actions in conducting the child abuse investigation, signing the declaration in

19  support of terminating the Costanichs' guardianship of E. and B., and revoking the child care

20  license.  Federal law controls the question of immunity in cases where a plaintiff alleges a 42

21  U.S.C. § 1983 claim.  Martinez v. California, 444 U.S. 277, 284 & n.8 (1980).  Absolute immunity

22  shields individuals from § 1983 liability if they perform a function that enjoyed absolute immunity

23

24       [6]    In addition to monetary damages, Plaintiff has also asked for injunctive relief from all
    defendants: Plaintiff asks the Court to enjoin DSHS "from using their foster care license revocation

25  process to remove children from the home without considering the children's own interests." (Compl.
    at 16.)  Defendants argue that this injunctive relief claim should also be dismissed and Plaintiff does

26  not suggest in her responsive briefing that this claim should survive.  Accordingly, any claim for
    injunctive relief is dismissed as well.  See Local CR 7(b)(2).

27

at common law. Miller v. Gammie, 335 F.3d 889, 897 (9th Cir. 2003).  It is only the specific

function performed and not the role or title of the official that matters. Id.  Officials acting in a

prosecutorial or judicial role, or performing functions closely associated with the judicial process,

are entitled to absolute immunity. Id. at 896-98; see also Doe v. Lebbos, 348 F.3d 820, 825 (9th

Cir. 2003).  "The official seeking absolute immunity bears the burden of showing that such

immunity is justified for the function in question." Buckley v. Fitzsimmons, 509 U.S. 259, 269

(1993).

In the context of child advocacy, the Ninth Circuit has held that although the scope of

absolute immunity for social workers is extremely narrow, see Miller, 335 F.3d at 898, "social

workers are entitled to absolute immunity in performing quasi-prosecutorial functions connected

with the initiation and pursuit of child dependency proceedings." Meyers v. Contra Costa County

Dep't of Soc. Servs., 812 F.2d 1154, 1157 (9th Cir. 1987).  That immunity applies even where a

complaint alleges caseworker misconduct or intentional wrongdoing. See Cunningham v.

Wenatchee, 214 F. Supp. 2d 1103, 1111 (E.D. Wash. 2002).  In Meyers, the court held that the

initiation and pursuit of child-dependency proceedings were prosecutorial in nature and warranted

absolute immunity.[7] Id.  In Doe, the Ninth Circuit held that a social worker was entitled to

absolute immunity for allegedly failing to adequately investigate allegations of abuse and neglect

and in allegedly fabricating evidence in the dependency petitions she prepared for the court. 348

F.3d at 825-26.  Because these actions were "part of her initiation and pursuit of child

dependency proceedings," the social worker deserved absolute immunity. Id. at 826.  However,

---

[7]     As Meyers explained: "Although child services workers do not initiate criminal
proceedings, their responsibility for bringing dependency proceedings, and their responsibility to
exercise independent judgment in determining when to bring such proceedings, is not very different
from the responsibility of a criminal prosecutor. The social worker must make a quick decision based
on perhaps incomplete information as to whether to commence investigations and initiate proceedings
against parents who may have abused their children. The social worker's independence, like that of
a prosecutor, would be compromised were the social worker constantly in fear that a mistake could
result in a time-consuming and financially devastating civil suit." Id. at 1157.

the court did not extend absolute immunity (and only extended qualified immunity) to the social

worker's actions in maintaining the child outside the home and in referring the child for a sexual

abuse evaluation without court order or parental consent. Id.  Thus, the touchstone for absolute

immunity in the child advocacy context appears to be whether the actor's conduct is sufficiently

related to the prosecution of dependency proceedings.

Defendant Duron argues that she is entitled to absolute immunity for her actions

investigating the child abuse and neglect referral and filing a declaration in support of the State's

guardianship termination proceedings.  Under RCW 26.44.050, DSHS and CPS were required to

investigate the referral made against Ms. Costanich.  The results of that investigation led to the

State's decision to move to terminate guardianship.  A sufficient connection between the

investigation and filing of the declaration and the judicial process of terminating guardianship

exists such that Ms. Duron's actions warrant the protections of absolute immunity.

Even if not deserved for quasi-prosecutorial actions, Defendant Duron deserves absolute

immunity for her filing of the declaration because witnesses in judicial proceedings receive

absolute immunity for their testimony. Briscoe v. LaHue, 460 U.S. 325, 345-46 (1983); Burns v.

King County, 883 F.2d 819, 822 (9th Cir. 1989).

Defendants also argue that the revocation of the foster care license is quasi-prosecutorial

in nature and therefore covered by absolute immunity.  Plaintiff does not appear to dispute this.

The Supreme Court has held that absolute immunity shields federal officials who perform

adjudicatory functions within a federal agency. Butz v. Economou, 438 U.S. 478, 512-13 (1978).

Defendants cite to Washington and California state opinions extending absolute immunity from §

1983 claims to state agency officials who have revoked licenses.  In Hannum v. Friedt, 88 Wn.

App. 881, 888 (1997), the Washington Court of Appeals relied on Butz in holding that a director

and administrator at the state department of licensing enjoyed absolute immunity for their decision

to charge the licensee with violating the licensing statute and for their suspension of the license.

In Gensburg v. Miller, the California Court of Appeals held that the revocation of a foster care

ORDER — 14

1    license deserved absolute immunity. 31 Cal. App. 4th 512, 521 (1995) ("In implementing

2    disciplinary action to protect the welfare of foster children under the [plaintiffs'] care, the State

3    DSS defendants were acting in a prosecutorial role. . . .  State officials making a decision whether

4    to invoke suspension remedies pursuant to statute are acting in a quasi-judicial capacity, and are

5    entitled to judicial immunity from section 1983 claims.").  Although the holdings in Hannum and

6    Gensburg are not binding on this Court, they are persuasive.  Ms. Duron and Ms. McKinney both

7    participated in the revocation of the foster care license, an act both prosecutorial and judicial in

8    nature, and deserve absolute immunity for that act.  Defendant Bulzomi reviewed the revocation

9    decision and signed the letter informing Ms. Costanich that her license was revoked.  Mr. Bulzomi

10   deserves absolute immunity for those acts.

11        In sum, Defendant Duron deserves absolute immunity from § 1983 liability for her actions

12   (1) investigating the child abuse and neglect referral, (2) filing a declaration in support of the

13   State's guardianship termination proceedings, and (3) facilitating the foster care license

14   revocation.  Defendants McKinney and Bulzomi deserve absolute immunity from a federal § 1983

15   claim arising from the revocation of Plaintiff's foster care license.

16        **C.    Qualified Immunity**

17        Even if absolute immunity were not available, all of the individual defendants are entitled

18   to qualified immunity because it would not have been clear to reasonable officials in their

19   positions that their conduct was unlawful. See Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)

20   (holding that qualified immunity shields § 1983 defendants "from liability for civil damages insofar

21   as their conduct does not violate clearly established statutory or constitutional rights of which a

22   reasonable person would have known").  A two-step process controls the qualified immunity

23   analysis.  First, the court must determine whether "[t]aken in the light most favorable to the party

24   asserting injury, . . . the facts alleged show the officer's conduct violated a constitutional right."

25   Saucier v. Katz, 533 U.S. 194, 201 (2001).  If the facts as alleged do show a violation of a

26   constitutional right, "then the court must proceed to determine whether the right was 'clearly

27

1    established,' *i.e.*, whether the contours of the right were already delineated with sufficient clarity

2    to make a reasonable officer in the defendant's circumstances aware that what he was doing

3    violated the right." Devereaux v. Abbey, 263 F.3d 1070, 1074 (9th Cir. 2001) (citing Saucier, 533

4    U.S. at 201).

5         The moving defendant bears the burden of proving that she is entitled to qualified

6    immunity. Moreno v. Baca, 431 F.3d 633, 638 (9th Cir. 2005).  Nevertheless, "[w]here the

7    defendant raises the affirmative defense of qualified immunity, the initial burden is upon the

8    plaintiff to show that the rights were clearly established, after which the defendant bears the

9    burden of proving that his conduct was reasonable." Shoshone-Bannock Tribes v. Fish & Game

10   Comm'n, 42 F.3d 1278, 1285 (9th Cir. 1994).

11        Plaintiff has failed to identify a clearly established right that Defendants violated.  In her

12   complaint, Plaintiff alleges that Defendants' actions violated her "civil rights" and her "right to

13   due process" and "have wrongfully deprived her of her liberty and her property." (Compl. at 10.)

14   These rights are too nebulous to be "clearly established" for the purposes of qualified immunity

15   analysis.  In her briefing, the only clearly established federal right that Plaintiff identifies is the

16   constitutional right "not to be subjected to criminal charges on the basis of false evidence that was

17   deliberately fabricated by the government."[8] See Devereaux, 263 F.3d at 1074-75.  But Plaintiff

18   has not been subjected to criminal charges — instead, DSHS made a finding of emotional abuse,

19   initiated guardianship termination proceedings, and revoked her foster care license.  Devereaux is

20   distinguishable.

21        Even if the rule articulated in Devereaux were applicable here, Plaintiff has not provided

22   evidence showing that Defendants deliberately made false statements and fabricated evidence to

23

24        [8]    Plaintiff has also cited to several Washington cases holding that state employees who
     act in bad faith do not deserve qualified immunity. See Tyner v. State Dep't of Social & Health
25   Servs., 141 Wn.2d 68 (2000); Lesley v. Dep't of Social & Health Servs., 83 Wn. App. 263 (1996).
     But those cases discuss qualified immunity under state law from state law claims.  Whether qualified
26   immunity is available under state law is irrelevant to a § 1983 qualified immunity analysis.  To the
     extent that those cases also discuss § 1983 qualified immunity, they are not binding on this Court.
27

ORDER — 16

1  make a false finding of abuse.  To make out a deliberate-fabrication-of-evidence claim, Plaintiff

2  must point to evidence that shows that Defendants "continued their investigation of [Plaintiff]

3  despite the fact that they knew or should have known that [she] was innocent" or "used

4  investigative techniques that were so coercive and abusive that they knew or should have known

5  that those techniques would yield false information." Devereaux, 263 F.3d at 1076.  Plaintiff has

6  pointed to discrepancies in Ms. Duron's investigation and the reporting of her investigation —

7  that Ms. Duron disregarded the statements of some of the adult witnesses (see Duron Decl. ¶ 11);

8  that she reported that she "interviewed" certain individuals, including therapists and doctors, even

9  though she had only spoken to or contacted those witnesses (see Plf's Mot., Exs. 14-18); and that

10  she twisted witnesses' words and/or attributed statements to some of the witnesses that they did

11  not make (see Plf's Resp., Ex. 2).  She has also pointed to errors in records and testimony made

12  by the other defendants. (See Plf's Resp. at 4.)  But a careless or inaccurate investigation that

13  does not ensure an error-free result does not rise to the level of a constitutional violation.

14  Devereaux, 263 F.3d at 1076-77; see also Gausvik v. Perez, 345 F.3d 813, 817 (9th Cir. 2003).

15  Moreover, there is no constitutional right to be free from a child abuse investigation, see Croft v.

16  Westmoreland County Children & Youth Servs., 103 F.3d 1123, 1125 (3d Cir. 1995), nor is there

17  a constitutional right to have a child abuse investigation conducted in a particular way.

18  Devereaux, 263 F.3d at 1075.

19          In Gausvik, the evidence revealed that a police officer investigating allegations of child

20  abuse inaccurately stated in his probable cause affidavit that the children tested "positive" for child

21  abuse (when the tests were only "suggestive" or "consistent" with child abuse) and incorrectly

22  stated that eight children accused the plaintiff of child abuse when, in fact, only two had positively

23  identified him. 345 F.3d at 817.  The Ninth Circuit held that although the affidavit "may have been

24  careless or inaccurate," it did not show that the officer continued the investigation despite

25  knowing that plaintiff was innocent. Id.  Qualified immunity was therefore appropriate on the

26  falsification-of-evidence claim. Id.  Likewise, in Devereaux, a foster father was investigated and

27

ORDER — 17

1    prosecuted for alleged sexual abuse of foster children living in his home. 263 F.3d at 1073.  The

2    detective investigating the case employed aggressive interviewing techniques, including lengthy

3    interviews of young children. Id. at 1073.  Some of the children initially denied abuse, but when

4    questioned further ultimately accused Devereaux of abusing them. Id. at 1077.  The Ninth Circuit

5    upheld the district court's grant of qualified immunity, holding that plaintiff did not have a right to

6    an error-free child abuse investigation. Id. at 1075-77.  The court noted that interviewers of child

7    witnesses of suspected abuse must be permitted to exercise some discretion in deciding when to

8    accept initial denials and when to reject them and proceed further with the investigation. Id. at

9    1077.  Because there is no constitutional right to have a child abuse investigation carried out in a

10   particular way, and because plaintiff failed to make the requisite showing for a deliberate

11   fabrication-of-evidence claim, qualified immunity was warranted. Id. at 1075-77.

12        Here, Plaintiff asks the Court to assume that because the agency and its employees made

13   recording errors and misstatements, they deliberately fabricated evidence against her.  Even

14   looking at the evidence in the light most favorable to Ms. Costanich, Plaintiff has not raised a

15   material issue of fact on the issue of whether Defendants deliberately fabricated evidence.  The

16   evidence suggests that Ms. Duron conducted a careless and error-prone investigation and that her

17   superiors and co-workers failed to correct the errors that arose during the investigation.  But the

18   evidence does not show that she or any of the defendants intentionally manufactured a case

19   against Ms. Costanich.  Like in Gausvik and Devereaux, because Plaintiff has not shown that any

20   of the defendants deliberately fabricated false evidence, all of the individually named defendants

21   are entitled to qualified immunity.

22   **V.    Procedural Due Process**

23        Defendants assume that, in addition to her falsification-of-the-evidence claim, Plaintiff is

24   also asserting a procedural due process claim against them.  To make out a procedural due

25   process claim, a plaintiff must allege (1) a liberty or property interest protected by the

26   Constitution, (2) a deprivation of that interest by the government, and (3) lack of process.

27

ORDER — 18

1    Portman v. County of Santa Clara, 995 F.2d 898, 904 (9th Cir. 1993).  Here, Plaintiff never

2    alleges a lack of process.  Nor could she — Plaintiff received notice of the claims against her, a

3    nineteen day administrative hearing, an appeal to the DSHS review board, and multiple appeals in

4    state court.  Indeed, the process served her well — she won in front of the ALJ, the superior

5    court, and the court of appeals.  To the extent that she is alleging a procedural due process claim,

6    Defendants are granted summary judgment on that claim.

7    **VI.    State Law Claims**

8         The Court declines to exercise supplemental jurisdiction over the remaining state law

9    claims.  See 28 U.S.C. § 1367(c)(3) ("The district courts may decline to exercise supplemental

10   jurisdiction over a claim [over which it has supplemental jurisdiction] if . . . (3) the district court

11   has dismissed all claims over which it has original jurisdiction . . . .").  The Court has granted

12   summary judgment to Defendants on the claims over which the Court has original jurisdiction.

13   The remaining state law tort claims are better resolved in the state courts.  The remaining claims

14   involve issues related to a state social services agency acting in the areas of the state foster care

15   system and state guardianship proceedings — matters better suited for consideration in the state

16   courts.  These types of issues are preeminently matters of state law and are traditionally handled

17   by state courts.  See Elk Grove Unified Sch. Dist. v. Newdow, 542 U.S. 1., 12-13 (2004) (noting

18   that the Court customarily declines to intervene in domestic relations matters and observing that

19   "[t]he whole subject of the domestic relations of husband and wife, parent and child, belongs to

20   the laws of the States and not to the laws of the United States").  The four remaining state claims

21   are therefore dismissed without prejudice.

22                                        **Conclusion**

23        The Court GRANTS IN PART Defendants' motion for summary judgment and DENIES

24   Plaintiff's motion for summary judgment.  Defendant DSHS is not a "person" subject to § 1983

25   liability.  And the individually named defendants are immune from Plaintiff's federal claims.  The

26   Court declines to exercise supplemental jurisdiction over Plaintiff's state law tort claims, and

27

ORDER — 19

1    dismisses those claims without prejudice.

2           The clerk is directed to send a copy of this order to all counsel of record.

3           Dated: January 24th, 2008.

4

5

6           Marsha J. Pechman
            United States District Judge
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

ORDER — 20